**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE FOUNDATION FOR GLOBAL POLITICAL EXCHANGE, INC. 138 East 94th Street, Apartment 6E New York, NY 10128,<br><br>  Plaintiff,<br><br> v.<br><br>U.S. DEPARTMENT OF THE TREASURY 1500 Pennsylvania Ave., NW Washington, DC 20220,<br><br>JANET YELLEN, in her official capacity as the Secretary of the Treasury 1500 Pennsylvania Ave., NW Washington, DC 20220,<br><br>OFFICE OF FOREIGN ASSETS CONTROL U.S. Department of the Treasury Treasury Annex / Freedman's Bank Building 1500 Pennsylvania Ave., NW Washington, DC 20220,<br><br>BRADLEY SMITH, in his official capacity as the Director of the Office of Foreign Assets Control Treasury Annex / Freedman's Bank Building 1500 Pennsylvania Ave., NW Washington, DC 20220,<br><br>U.S. DEPARTMENT OF JUSTICE 950 Pennsylvania Ave., NW Washington, DC 20530, and<br><br>MERRICK GARLAND, in his official capacity as the Attorney General, 950 Pennsylvania Ave., NW Washington, DC 20530,<br><br>  Defendants. | Case No. 1:23-cv-3777 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      The Office of Foreign Assets Control ("OFAC") has authority to administer and enforce sanctions against individuals who have been "designated" by the U.S. government under various sanctions regimes. This authority, however, is limited by regulation, executive order, statute, and the First Amendment. This case arises from OFAC's unlawful reliance on this authority to stifle the exchange and examination of political ideas.

2.      The Foundation for Global Political Exchange ("Foundation") is a New York-registered not-for-profit corporation that promotes professional and academic enrichment through "Exchanges," which are made up of small-group, immersive dialogues focused on the political dynamics of a specific country or region. Through each Exchange, the Foundation offers participants from around the world—including journalists, human rights advocates, and government officials—the opportunity to engage with and question thirty to forty key players from across the political landscape. Past speakers include legislators, leaders of political parties and of political movements, government officials, prominent scholars, media commentators, and representatives of local non-profits. The Foundation selects speakers to reflect the most prominent and influential groups and viewpoints in that area. As a result, some speakers possess establishment views, and some challenge the status quo; some speakers have views that are aligned with those of the U.S. government, and some do not. Some speakers have views that many Americans would find misguided, disagreeable, or even abhorrent. The Foundation includes this array of speakers because it is not possible to develop a full understanding of a country's political reality without understanding and engaging with all of these perspectives.

3.      Since its inception, the Foundation has hosted more than 1,500 people from fifty-one different countries at more than fifty Exchanges, including twenty-one "Beirut Exchanges." The 21st Beirut Exchange took place in January 2023 in Beirut, Lebanon. In advance of that

Exchange, the Foundation informed OFAC that the approximately thirty speakers at the Exchange would include three people who had been designated under a U.S. sanctions regime, and two others who were members of a designated organization but had not been designated themselves. All five individuals are prominent and influential figures in Lebanese politics, and the Foundation believed that including them in the Exchange was vital to the integrity and usefulness of the convening. In its response to the Foundation, however, OFAC asserted that including the designated individuals would violate the agency's regulations because it would provide those individuals with "a platform for them to speak" and, thereby, provide them with a "service." OFAC reached the same conclusion with respect to the two speakers who had not been designated under any sanctions regime, reasoning that because they would be participating in the Exchange as "leaders" of a designated organization, they are "therefore also [designated]."

4.      The result of these determinations was to make clear that the Foundation would risk civil or criminal penalties if any of its Exchanges included any of these five individuals as speakers, or if they included any other individual whom OFAC had designated or who could be viewed by OFAC to be a leader of a designated organization.

5.      OFAC's determinations are unlawful. First, including a designated individual in political dialogue is not a "service" within the meaning of OFAC's regulations, and, in any event, the Foundation's Exchanges fall within statutory and regulatory exemptions that were specifically intended to protect the exchange of information and ideas. Second, OFAC's determination that two of the individuals are designated by virtue of their association with a designated group is unlawful because OFAC has not designated them in accordance with its regulations and the relevant executive orders. Finally, even if OFAC is correct that its regulations prohibit the Foundation from including designated individuals in its Exchanges, the regulations would violate

the First Amendment as applied here, because they would impose a prior restraint on protected speech and target disfavored viewpoints, content, and speakers, restricting the Foundation's expressive and associational activities without sufficient justification. While the government sometimes has legitimate interests in imposing sanctions on groups that are hostile to the United States or engaged in human rights abuses, prohibiting the Foundation from engaging in political dialogue with designated individuals undermines rather than serves those interests. In addition, if OFAC's interpretation of its regulations were correct and constitutional, it would have enormous consequences for public discourse, not only for organizations like the Foundation. It would also hamper the work of major media organizations, which routinely interview, quote, and even publish pieces by prominent political figures who are designated.

6.     For these reasons, explained further below, the Foundation respectfully asks the Court to declare that OFAC's interpretation and application of its regulations to prohibit the Foundation from including designated individuals in its Exchanges exceed the agency's statutory and regulatory authority and violate the First Amendment. The Foundation also respectfully asks the Court to enjoin Defendants from enforcing the relevant regulations and associated statutes against the Foundation for including designated individuals in its Exchanges.

## JURISDICTION AND VENUE

7.     This action arises under the U.S. Constitution; the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*; the United Nations Participation Act of 1945, 22 U.S.C. § 287c; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

8.     This Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; Rules 57 and 65 of the Federal Rules of Civil Procedure; 5 U.S.C. § 702; and the Court's inherent equitable powers.

9.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(A).

## PARTIES

10.    Plaintiff The Foundation for Global Political Exchange, Inc., is a New York not-for-profit corporation that works to promote professional and academic engagement through small group convenings in the Middle East and North Africa. The Foundation is a "person" within the meaning of 5 U.S.C. § 551(2).

11.    Defendant U.S. Department of the Treasury is an agency of the federal government of the United States located in Washington, DC. It is responsible for implementing and enforcing the Lebanon Sanctions Regulations ("LSR"), 31 C.F.R. Part 549; the Global Magnitsky Sanctions Regulations ("GMSR"), 31 C.F.R. Part 583; and the Global Terrorism Sanctions Regulations ("GTSR"), 31 C.F.R. Part 594.

12.    Defendant Janet Yellen is the Secretary of the Treasury. She is responsible for designating individuals and entities under Executive Order 13,224, 66 Fed. Reg. 49079 (2001) (as amended), in consultation with the Secretary of State, the Attorney General, and the Secretary of Homeland Security and consistent with the procedures laid out in the Executive Order and associated regulations, and is responsible for administering and enforcing the LSR, the GMSR, and the GTSR. Defendant Yellen is sued in her official capacity.

13.    Defendant Office of Foreign Assets Control, a division of the U.S. Department of the Treasury located in Washington, D.C., is responsible for implementing and administering the LSR, the GMSR, and the GTSR, including enforcing economic sanctions against designated individuals and entities.

14.    Defendant Bradley Smith is the Director of the Office of Foreign Assets Control. Pursuant to the authority delegated by the Secretary of the Treasury under 31 C.F.R. § 594.802, Defendant Smith is authorized to take "[a]ny action that the Secretary of the Treasury is authorized

to take pursuant to Executive Order 13224." He is thus authorized to designate individuals and entities consistent with Executive Order 13,224 and the procedures prescribed by regulation, and is responsible for administering and enforcing the LSR, the GMSR, and the GTSR. Defendant Smith is sued in his official capacity.

15.     Defendant U.S. Department of Justice is an agency of the federal government of the United States located in Washington, DC. It is responsible for investigating and prosecuting violations of federal laws, including IEEPA.

16.     Defendant Merrick Garland is the Attorney General of the United States. He is responsible for prosecuting violations of federal laws, including IEEPA. Defendant Garland is sued in his official capacity.

## FACTUAL ALLEGATIONS

### *Legal Framework*

### *IEEPA*

17.     IEEPA provides the president with power to impose economic sanctions to address "unusual and extraordinary" external threats to the United States when the president has declared a national emergency with respect to those threats. 50 U.S.C. § 1701(a). Subject to several key limitations, IEEPA grants the president the authority to "regulate, . . . prevent or prohibit" any "dealing in" or "transactions involving[] any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B). For those who violate these regulations, IEEPA authorizes the imposition of civil or criminal penalties under 50 U.S.C. § 1705.

18.     Congress passed IEEPA in 1977 in response to successive presidents' sweeping exercise of emergency powers under the 1917 Trading with the Enemy Act. Explaining the contours of the new law, the House Committee on International Relations stated that it intended

the president's power under IEEPA to be "clearly limited to the regulation of international economic transactions." H.R. Rep. No. 95–459, at 10–11 (1977). It noted that "the bill d[id] not include authorities more appropriately lodged in other legislation, such as . . . authority to control noneconomic aspects of international intercourse such as personal communications[.]" *Id.* at 11. Congress made this explicit in Section 203(b)(1) of the law, which states that "[t]he authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communications which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1). This section was "designed both to preserve First Amendment freedoms of expression, and to preclude policies that would totally isolate the people of the United States from the people of any other country." H.R. Rep. No. 95–459, at 16 (1977).

19.     Just over a decade after Congress passed IEEPA, Congress amended the law to make clear that "no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment." H.R. Rep. No. 100–40, pt. 3, at 113 (1987). Through the so-called "Berman Amendment," Congress barred the executive branch from relying on IEEPA to regulate or prohibit "the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials." Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100–418, § 2502(b), 102 Stat. 1107, 1371–72 (codified as amended at 50 U.S.C. § 1702(b)).

20.     Over the next few years, the Treasury Department construed the scope of the Berman Amendment narrowly, prompting Congress to intervene again. In 1994, Congress clarified and expanded the scope of the Berman Amendment through the Free Trade in Ideas Act. The Act

explained that "[i]t is the sense of the Congress that the President should not restrict travel or exchanges for informational, educational, religious, cultural, or humanitarian purposes or for public performances or exhibitions, between the United States and any other country." Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103–236 § 525(a), 108 Stat. 382, 474 (1994). Through the Act's provisions, Congress sought to "protect the constitutional rights of Americans to educate themselves about the world by communicating with peoples of other countries in a variety of ways, such as by sharing information and ideas with persons around the world, traveling abroad, and engaging in educational, cultural and other exchanges with persons from around the world." H.R. Rep. No. 103–482, at 239 (1994) (Conf. Rep.). As revised, IEEPA now expressly forbids the executive branch from relying on the statute to regulate "the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials[.]" 50 U.S.C. § 1702(b)(3).

### The Sanctions Regimes at Issue in This Case

21.    This case concerns three sets of sanctions regulations: the Lebanon Sanctions Regulations, 31 C.F.R. Part 549; the Global Magnitsky Sanctions Regulations, 31 C.F.R. Part 583; and the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594. The Treasury Department instituted these regulations pursuant to presidential executive orders that invoked IEEPA for authority to do so. *See* Exec. Order No. 13,441, 72 Fed. Reg. 43499 (2007) (invoking IEEPA to authorize the LSR); Exec. Order No. 13,818, 82 Fed Reg. 60839 (2017) (invoking IEEPA to authorize the GMSR); Exec. Order No. 13,224 (invoking IEEPA and the U.N. Participation Act to authorize the GTSR).

22.    While the three sanctions regimes—the three sets of regulations and their authorizing executive orders—differ in some respects, they are the same in important ways.

8

23.     First, all of them forbid the provision of "services" to or for the benefit of blocked individuals or entities. *See* 31 C.F.R. § 549.201 (LSR); 31 C.F.R. § 583.201 (GMSR); 31 C.F.R. § 594.204 (GTSR); *see also* Exec. Order No. 13,441 § 1(c) (LSR); Exec. Order No. 13,818, § 4 (GMSR); Exec. Order No. 13,224, § 2(a) (GTSR).

24.     Second, none of them defines the term "service," though the LSR and GTSR provide examples. Under the LSR, "U.S. persons may not . . . provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, or other services to a person whose property and interests in property are blocked[.]" 31 C.F.R. § 549.405(b). Similarly, under the GTSR, "U.S. persons may not . . . provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services to a person whose property or interests in property are blocked[.]" 31 C.F.R. § 594.406(b).

25.     Third, all three sanctions regimes exempt transactions involving personal communications and information or informational materials. The LSR and GMSR include provisions that expressly exempt these transactions. *See* 31 C.F.R. § 549.206 (LSR); 31 C.F.R. § 583.205 (GMSR). The GTSR does not include a similar provision, but the executive order that authorizes the GTSR permits the blocking of funds, goods, or services "[e]xcept to the extent required by section 203(b) of IEEPA"—the provision that exempts personal communications and information or informational materials. *See* Exec. Order No. 13,224 § 2(a) (citing 50 U.S.C. § 1702(b)).

26.     Fourth, the Secretary of the Treasury's discretion to determine which individuals and entities to designate under each of the regimes is broad. *See* Exec. Order No. 13,441, § 1(a)(i); Exec. Order No. 13,818, § 1(a)(ii)–(iii); Exec. Order No. 13,224, § 1(b)–(d). Each of the relevant executive orders authorizes the imposition of sanctions against multiple categories of people, and

some of these categories could be capacious. For example, Executive Order 13,441 authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to designate any person she determines "pose[s] a significant risk" of taking actions "that have the purpose or effect of undermining Lebanon's democratic processes or institutions." Exec. Order No. 13,441, § 1(a)(i)(A). And Executive Order 13,818 authorizes the Secretary of the Treasury, in consultation with the Secretary of State and Attorney General, to designate any person she determines has "directly or indirectly engaged" in a "serious human rights abuse." Exec. Order No. 13,818, § 1(a)(ii)(A).

27.     The Treasury Department's regulations lay out the procedures that the Department must follow to designate an individual or entity under these sanctions regimes. *See, e.g.*, 31 C.F.R. § 594.201(a)(2) (requiring a consultation process before designating certain individuals). The names of designated persons must be published in the Federal Register and incorporated into OFAC's publicly available Specially Designated Nationals and Blocked Persons List ("SDN List"). *See* 31 C.F.R. § 549.201(a), Note 1 (LSR); 31 C.F.R. § 583.201, Note 1 (GMSR); 31 C.F.R. § 594.201(a), Note 2 (GTSR).

### *OFAC's Licensing Process*

28.     Anyone who wants to engage in an activity or transaction that would otherwise be prohibited by sanctions regulations can seek a license from OFAC to engage in that activity. OFAC grants both "general" and "specific" licenses. According to OFAC, "a general license authorizes a particular type of transaction for a class of persons without the need to apply for a license. A specific license is a written document issued by OFAC to a person or entity, authorizing a particular transaction in response to a written license application." OFAC considers applications for specific licenses on a case-by-case basis.

29.     OFAC's process for considering specific license applications lacks any easily discernible standards. The relevant sanctions regulations do not describe the criteria OFAC uses to determine whether to grant or deny specific licenses, and OFAC does not appear to have published the standards by which those determinations are made.

30.     Nor does OFAC commit to resolving applications for specific licenses within any specific timeframe. According to the agency, "OFAC will notify applicants in writing as soon as a determination has been made on their application," but "the length of time for determinations to be reached will vary depending on the complexity of the transactions under consideration, the scope and detail of interagency coordination, and the volume of similar applications awaiting consideration."

31.     There is no formal regulatory appeal process for the denial of a specific license application. OFAC's website states that the denial of an application for a specific license constitutes "final agency action."

### *The Foundation for Global Political Exchange*

32.     The Foundation for Global Political Exchange works to promote professional and academic enrichment by organizing small-group, direct-engagement convenings in the Middle East and North Africa. The Foundation is a 501(c)(3) organization that was registered in New York State in 2019 as a not-for-profit corporation.[1]

33.     The Foundation's roots date back to June 2008. After sustained violence across Lebanon ended in a negotiated political settlement known as the "Doha Accords," a group of individuals observed an urgent need among foreign policymakers, academics, and journalists for

---

[1] Though the organization was not known as the Foundation for Global Political Exchange before its incorporation in 2019, this Complaint will refer to both the incorporated entity and its predecessor organization as the "Foundation" throughout.

a more direct and comprehensive understanding of Lebanon, the dynamics of the conflict, and any realistic avenues for peacebuilding. Soon after, they organized the inaugural "Beirut Exchange," the first of dozens of Exchanges held throughout the region.

34.    The Foundation believes that understanding the political landscape in a given country requires engagement with the diverse and competing viewpoints of multiple stakeholders and decisionmakers. The Foundation works to achieve its mission primarily through immersive dialogues in the format of multi-day convenings called "Exchanges," which focus on a specific country or region. Occasionally, the Foundation engages in other forms of public education and advocacy—for example, the Foundation's director at times writes about the insights that he draws from the Exchanges.

35.    Exchanges are designed to offer participants the opportunity to critically engage with the full range of perspectives in a country or region, covering all influential parties, movements, and actors to the best of the Foundation's ability. Anyone interested in gaining a deeper, more nuanced understanding of an Exchange's area of focus can apply to participate. The convenings make it possible for participants to meet with a broad array of speakers, something that would be logistically and financially difficult, or even impossible, for the individual participants to organize on their own. Past participants have included journalists, academics, students, human rights advocates, and U.S., Canadian, European, and Australian government officials.

36.    Each convening typically consists of thirty to forty individual meetings between the convening's participants and the included speakers. Past speakers include leading scholars, politicians, activists, local government officials, U.S. government officials, and even a recipient of the Nobel Peace Prize. The Foundation decides which speakers to include in its Exchanges based primarily on whether and how those speakers are likely to contribute to the participants' overall

understanding of the politics of the region. Though some speakers are affiliated with organizations or political parties, participants are not chosen simply because of that affiliation or with the expectation that they will restate their organization's public views. They are encouraged to give their personal thoughts and to speak from their own experiences. The aim of the Exchanges is not to promote any particular perspective but rather to allow participants to better understand the major actors and viewpoints that are shaping a given political landscape.

37.     The Foundation's independence is critical to its credibility and its effectiveness. Funding for the Exchanges comes from the participants themselves, who pay a participation fee to cover the convening's operating costs, unless they receive a scholarship from the Foundation to attend. Beyond these fees, the Foundation does not accept any government, commercial, or non-profit funding. While the Foundation offers honoraria to certain speakers in its Exchanges, it does not offer honoraria or any other form of payment to, or accept any payment from, government officials, political party-affiliated individuals, anyone on the SDN List, or anyone else it determines to be subject to U.S. sanctions authorities.

38.     The Exchanges foster dialogue in which speakers and participants communicate their perspectives openly. Only the convening's participants and Foundation staff attend meetings with individual speakers. The meetings are held under the Chatham House Rule—that is, "participants are free to use the information received, but neither the identity nor the affiliation of the speaker(s), nor that of any other participant, may be revealed." *Chatham House Rule*, Chatham House, The Royal Inst. of Int'l Affs., https://perma.cc/4SEJ-FLAG (last updated 2023). Participants often meet with speakers at their place of work, where the speakers typically begin the conversation with a few minutes of unprepared remarks on a topic that is politically salient at

that time. After the speaker has made opening remarks, participants ask questions of the speaker and critically engage with and challenge the speaker's ideas and viewpoints.

### *Past Exchanges*

39.     To date, the Foundation has hosted more than fifty Exchanges across the Middle East and North Africa, focusing on Lebanon, Tunisia, Iraq, Syria, Libya, and Yemen. More than 1,500 people from fifty-one different countries have attended at least one of these convenings, with dozens of alumni returning to Exchanges in later years.

40.     The first Exchange took place in Beirut in June 2008 over a period of three weeks, with twenty participants from eleven countries meeting with more than forty-five speakers across Lebanon. The participants studied Arabic in the mornings and met with speakers in the afternoons and evenings. Most of the participants were academics or were affiliated with think tanks in the United States or Europe. Many were visiting Lebanon for the first time, and many of those who had visited Lebanon before had not previously met with such a wide range of Lebanese social, political, and religious leaders. Through the meetings, participants interacted directly and at length with the country's key stakeholders and had the opportunity to question them and grapple as a group with their competing ideas and positions. For example, participants heard firsthand from then–U.S. Ambassador to Lebanon Michele J. Sison about the United States' perspective on the Doha Accords, and about the United States' concerns relating to the role Hizballah was playing in the country and the wider region. Participants at subsequent Beirut Exchanges have discussed, among other topics, the political and economic crises in Lebanon; the October 17, 2019 Revolution; the Syrian War and its implications; the United Nations' role in the country and region; and the state of human rights in Lebanon.

41.     In addition to the twenty-one Beirut Exchanges, the Foundation has hosted sixteen Tunis Exchanges and eight Yemen Exchanges. These recurring convenings enable new and

returning participants to learn about the evolving political situations in those countries. The Foundation has also held Exchanges focused on other countries in response to changing political dynamics. For example, the Foundation hosted a Libya Exchange in 2017 to examine the civil conflict within the country.

42.    Over the years, the Foundation's Exchanges have attracted a diverse group of participants, including officials from the U.S. Department of State, the U.S. Department of Justice, and the U.S. Agency for International Development; officials from the United Nations; ambassadors from Canada and Australia; journalists from CBS News and Christianity Today; and academics from leading universities, such as the Johns Hopkins School of Advanced International Studies, the School of International and Public Affairs at Columbia University, and Oxford University. Participants have met with civil servants, such as representatives of the Office of the Prime Minister of Lebanon and the Tunisian Ministry of Foreign Affairs; politicians, such as the former president of Tunisia and members of parliament; human rights advocates from organizations such as the International Center for Transitional Justice; regional experts from academic institutions such as NYU Abu Dhabi, the European University of Tunis, and Cambridge University; and journalists from a variety of American and international outlets.

43.    These Exchanges have provided meaningful benefits to past participants, deepening their perspectives and enriching their work.

44.    For example, one past participant is Scott Bohlinger, a U.S. citizen who works at the International NGO Safety Organisation ("INSO") as the regional director for the Middle East and Central Asia. INSO supports other NGOs working in conflict zones with capacity building and training related to safety, security, and access. INSO encourages staff and partner NGOs to take part in Exchanges because they are among the best ways for staff to stay abreast of the

15

changing politics of the relevant countries. Mr. Bohlinger participated in the Erbil Exchange in 2017 and the Yemen and Gulf Exchange in 2023. In his experience, Exchanges provide a unique and vital resource for his work, allowing him not only to learn who the key stakeholders in the region are, but also to understand their points of view. From Mr. Bohlinger's perspective, a key strength of Exchanges is their format. Policymakers and other officials face active and often critical questioning by Exchange participants. When Mr. Bohlinger and his fellow participants questioned political leaders during the Erbil Exchange, for example, those leaders responded by explaining or defending their policy positions in revealing ways. Because the Exchanges make him more effective in his work, Mr. Bohlinger intends to attend future Exchanges, including the next Beirut Exchange.

45.     Another past participant is Robert Morris, a U.S. citizen who works as an independent political commentator and has a successful YouTube channel. His videos frequently discuss American foreign policy, with a focus on the United States' role in the Middle East. To inform his work, he has attended several Exchanges, including the 2021 Beirut Exchange, the 2021 Tunis Exchange, and the 2022 and the 2023 Yemen Exchanges. Participation in Exchanges has deepened his understanding of the political dynamics of the regions by introducing him to a broad range of perspectives. For example, he credits the opportunity to speak with influential stakeholders during the Yemen Exchanges with giving him a more nuanced understanding of the conflict in Yemen, including the United States' and Saudi Arabia's involvement. These conversations helped him better understand the difficult decisions facing Saudi and U.S. policymakers. Mr. Morris has used the insights he has gained during the Exchanges to inform his commentary. For example, after attending the 2021 Tunis Exchange, he produced a YouTube segment explaining Tunisia's constitutional structure and its weaknesses. And following the 2021

Yemen Exchange, he produced another segment explaining Yemen's political history during the Cold War. Because the Exchanges have been instrumental in helping him understand the politics of the relevant regions, he intends to participate in future Exchanges.

46.     Another past participant is Nathan Wexler, a U.S. citizen with a deep personal and academic interest in the history and politics of Lebanon. He participated in the 2015 Beirut Exchange while a student at the University of California, Berkeley, where he was studying Hebrew, Arabic, and Comparative Literature. His interest in these issues derives in part from his experiences attending Jewish schools from preschool through twelfth grade and studying and volunteering in Israel. He participated in the Beirut Exchange to enrich his understanding of the region, and to challenge some of his own preconceived notions about Lebanon, its people, and its politics. The Exchange provided him with an unparalleled opportunity to do so, allowing him to hear from and question a wide range of Lebanon's key political leaders and scholars, all with different experiences and viewpoints—access he would have struggled to gain on his own. Attending the Beirut Exchange has meaningfully shaped his views of the politics of the region, and he credits the experience with enabling him to further explore the region on his own with a deeper understanding of the political and social dynamics.

47.     Finally, the director of the Foundation, Nicholas Noe, has also benefited from his participation in Exchanges. Mr. Noe, a U.S. citizen, has attended most of the Foundation's Exchanges and has been an active participant in them. The Exchanges have provided Mr. Noe with a deeper understanding of the politics of the relevant regions, which Mr. Noe relies on to inform his work as the Foundation's director. This works includes moderating discussions and delivering opening and closing remarks at Exchanges, as well as curating the set of speakers at each Exchange. Mr. Noe finds Exchanges particularly valuable and enriching because he can hear from

a wide range of stakeholders. This allows Mr. Noe to serve as a better-informed and credible interlocutor in the conversations that occur during an Exchange. Finally, Mr. Noe has written publicly about the insights that he draws from Exchanges. For example, he published three articles that were directly informed by the 2021 Beirut Exchange.

### The Foundation's 21st Beirut Exchange

48.     The Foundation's 21st Beirut Exchange took place from January 7 to January 14, 2023. As explained on the Foundation's website, the Foundation "attempted to assemble a diverse group of speakers . . . that [it] believe[d] represent[ed] the wide spectrum of thought, position and action characteristic of Lebanon itself." Among the speakers the Foundation included were current and former Lebanese government officials; representatives from Lebanon's major political parties; officials from the United Nations and the World Bank; local journalists; academics; and staff from local and international human rights and civil society organizations. The Foundation planned more than thirty-five meetings between the individual speakers and the fifteen participants in an effort to provide a full picture of contemporary Lebanese politics.

49.     Three of the speakers whom the Foundation intended to include in the Exchange are designated under a U.S. sanctions regime, and two others are members of a designated organization. They are: Gebran Bassil, whom OFAC has designated pursuant to Executive Order 13,818 and who is subject to the GMSR; Jamil Sayyed, whom OFAC has designated pursuant to Executive Order 13,441 and who is subject to the LSR; Usama Hamdan, whom OFAC has designated as a Specially Designated Global Terrorist ("SDGT") and who is subject to the GTSR; and Ammar Moussawi and Ali Fayyad, who are both members of Hizballah, an organization designated as an SDGT.

50.     The Foundation sought to include Gebran Bassil in the Beirut Exchange because of his extensive personal involvement in the recent U.S.-mediated negotiations that resulted in the

2022 maritime boundary agreement between Lebanon and Israel. Because the maritime agreement was one of the most significant political developments in Lebanon the previous year, the Foundation sought to provide participants the opportunity to question Mr. Bassil about his role in and his perspective on the agreement. Given Mr. Bassil's knowledge of the intricacies of the negotiations, his perspective would have provided unique insights that the participants could not have gotten from another speaker. Mr. Bassil is also a member of parliament and leads one of the largest political parties in Lebanon, the Free Patriotic Movement, which currently holds the second most seats in the Lebanese parliament. Mr. Bassil himself has been a prominent official in Lebanon for well over a decade. He has previously served as the Minister of Foreign Affairs and Emigrants, the Minister of Energy and Water, and the Minister of Telecommunications. Before reaching out to OFAC, the Foundation contacted Mr. Bassil about his potential involvement in the 21st Beirut Exchange, and Mr. Bassil indicated his willingness to participate.

51.    The Treasury Department designated Mr. Bassil pursuant to Executive Order 13,818 after concluding that he was "a current or former government official, or a person acting for or on behalf of such an official, who is responsible for or complicit in, or who has directly or indirectly engaged in corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption related to government contracts or the extraction of natural resources, or bribery." Mr. Bassil's designation was published in the Federal Register, and he is listed on OFAC's SDN List.

52.    The Foundation sought to include Jamil Sayyed because he is a current member of Lebanon's parliament and because he has played a central role in the Lebanese security establishment for decades, including as the head of the Lebanese General Security Directorate.

Mr. Sayyed is one of the leading Shiite politicians in Lebanon and is seen as a possible future contender for the speakership of the Lebanese parliament.

53.     The Treasury Department designated Mr. Sayyed pursuant to Executive Order 13,441 after concluding that he had "contribut[ed] to the breakdown of the rule of law in Lebanon." Mr. Sayyed's designation was published in the Federal Register, and he is listed on OFAC's SDN List.

54.     The Foundation sought to include Usama Hamdan because he is a representative of Hamas, which is one of the largest Palestinian factions in Lebanon. Lebanon hosts nearly half a million Palestinian refugees, many of whom live in various "camps" throughout the country. The Foundation hoped that Exchange participants would be able to hear from, and question, Mr. Hamdan about the presence of Palestinian refugees in Lebanon and the influential role of Palestinians, Hamas, and other Palestinian groups in the country. Before reaching out to OFAC, the Foundation contacted Mr. Hamdan about his potential involvement in the 21st Beirut Exchange, and Mr. Hamdan indicated his willingness to participate.

55.     The Treasury Department designated Mr. Hamdan as a Specially Designated Global Terrorist ("SDGT") after concluding that he was a senior leader of Hamas, which is a designated terrorist organization. Mr. Hamdan's designation was published in the Federal Register, and he is listed on OFAC's SDN List.

56.     The Foundation sought to include Ammar Moussawi in the Beirut Exchange because he serves as Hizballah's Head of International Relations. In this capacity, he meets with top foreign officials from around the world, including officials from the EU and, earlier this year, the United Nations Special Coordinator for Lebanon, Joanna Wronecka. The Foundation had hoped he would speak with Exchange participants about Hizballah's priorities and motivations

and about Hizballah's perspective on the region's political dynamics. Before reaching out to OFAC, the Foundation contacted Mr. Moussawi about his potential involvement in the 21st Beirut Exchange, and Mr. Moussawi indicated his willingness to participate.

57.    Mr. Moussawi is a member of Hizballah, which is a designated terrorist organization, but he has not been designated under a sanctions regime and therefore is not listed in the Federal Register or on OFAC's SDN List.

58.    Finally, the Foundation sought to include Ali Fayyad in the Beirut Exchange because, as an elected member of parliament and a key member of Hizballah's parliamentary bloc, his perspective is crucial to understanding Hizballah's political priorities within Lebanon. Before reaching out to OFAC, the Foundation contacted Mr. Fayyad about his potential involvement in the 21st Beirut Exchange, and Mr. Fayyad indicated his willingness to participate.

59.    Mr. Fayyad is a member of Hizballah, which is a designated terrorist organization, but he has not been designated under a sanctions regime and therefore is not listed in the Federal Register or on OFAC's SDN List.

60.    For most of its operation, the Foundation did not have any reason to believe that OFAC would view the Exchanges it hosts as prohibited by U.S. sanctions law, because the Exchanges consist only of political dialogue. In 2020, however, the Foundation became concerned about how broadly OFAC might interpret its regulatory authority when reports emerged that the video conferencing service Zoom abruptly shut down several academic events involving Leila Khaled. Zoom cited concerns about U.S. sanctions and anti-terrorism laws, based on Ms. Khaled's association with the Popular Front for the Liberation of Palestine, a designated terrorist organization. After becoming aware of these reports, the Foundation decided not to include any designated individuals in its next Beirut Exchange, the 20th iteration, which was held virtually

over Zoom. The Foundation did not want to risk Zoom shutting down all or part of the 20th Beirut Exchange.

61.     Although the Foundation continued to believe it was consistent with U.S. law and foreign policy to host a conversation between designated individuals and the Exchange participants, given the reports about Zoom and out of an abundance of caution, on April 25, 2022, the Foundation sought a written assurance from OFAC that including the five speakers in its 21st Beirut Exchange would not violate U.S. sanctions law. Ex. A. The Foundation requested that, in the event OFAC determined that including the individuals in the Exchange was prohibited by sanctions law, OFAC issue a specific license permitting the Foundation to include the speakers in that Exchange. The Foundation clarified that there would be no payment given to or received from these individuals related to their inclusion in the Exchange.

62.     On June 23, 2022, the Foundation submitted a supplemental letter to OFAC, apprising the agency of the change of date for the convening from June 2022 to December 2022.

63.     On December 6, 2022, the Foundation received OFAC's response. In its letter, OFAC stated that Mr. Bassil is "blocked" under the GMSR, that Mr. Sayyed is "blocked" under the LSR, and that Mr. Hamdan is designated as an SDGT. Ex. B at 1. It also stated that, because Mr. Moussawi and Mr. Fayyad would be (in OFAC's words) "representing Hizballah in their capacities as Hizballah leaders," they were "therefore also SDGTs." *Id.*

64.     OFAC further informed the Foundation that "[t]he inclusion of the Blocked Speakers in the Conference and the provision of a platform for them to speak is considered to be a service by OFAC, which is prohibited pursuant to the GTSR, GMSR, and the LSR." *Id.* at 2. OFAC also denied the Foundation's request for a specific license based on OFAC's determination,

made in "consultation with the U.S. Department of State," that "it would be inconsistent with current licensing policy to issue a specific license." *Id.*

### *Impact of OFAC's Interpretation of its Regulations*

65.     OFAC's expansive interpretation of the term "service" has caused the Foundation to change how it operates and significantly compromised the Foundation's ability to pursue its mission.

66.     OFAC's determination that including the five speakers would violate U.S. sanctions law precluded the Foundation from including them in its 21st Beirut Exchange. As a result, the Foundation was able to convey a much less comprehensive and illuminating picture of political life in Lebanon than it otherwise would have. This gap in information and viewpoint created a skewed image of politics in the country, overweighting certain perspectives and omitting others entirely.

67.     For example, the Foundation had hoped to encourage a comprehensive discussion during the 21st Beirut Exchange about negotiations over the U.S.-mediated maritime boundary agreement between Lebanon and Israel, which had concluded only a few months earlier in October 2022. To that end, the Foundation had intended to have Mr. Bassil, Mr. Fayyad, and Mr. Moussawi speak about the sensitive negotiations and ultimate agreement. As noted above, Mr. Bassil was deeply involved in the negotiations and participated in key conversations during the process, some of which were conducted outside of the public eye. Mr. Bassil would thus have provided invaluable information to Exchange participants, including a unique perspective on the negotiations beyond just his knowledge of the issues. The Foundation had also hoped to speak to Mr. Fayyad and Mr. Moussawi about Hizballah's perceived acquiescence to the maritime boundary agreement, particularly in light of Hizballah's political influence in Lebanon and stated enmity toward Israel. The Foundation was especially interested in exploring these dynamics and their implications for

the possibility of de-escalation and peacebuilding. However, because of OFAC's determination that the Foundation could not include these speakers, the Foundation was forced to omit these essential viewpoints from its Exchange, depriving participants of the opportunity to enrich their understanding of regional dynamics and the historic maritime boundary agreement.

68.     OFAC's expansive interpretation of its regulations will have ramifications for the Foundation that extend far beyond the 21st Beirut Exchange. Though the Foundation will continue to hold its Exchanges, including its 22nd Beirut Exchange in 2024, it will not be able to include the range of speakers and views it believes is necessary to foster a comprehensive understanding of the relevant political landscapes. Because of OFAC's interpretation, the Foundation is effectively precluded from including the five already-barred individuals in future Exchanges. The Foundation understands that OFAC's interpretation will also preclude it from including other designated people in subsequent events, so it has decided not to include them, even if their participation is important to the integrity and comprehensiveness of those events. Finally, OFAC's interpretation of its regulations impedes the Foundation's ability to include *non*-designated individuals in its Exchanges, because OFAC has taken the position that some non-designated individuals are in fact designated because of their connection to designated organizations.

69.     Given OFAC's stated position in its December 2022 letter—that "it would be inconsistent with current licensing policy to issue a specific license authorizing [the Foundation] to include the Blocked Speakers in the Conference"—it appears that OFAC will continue to deny the Foundation's requests for specific licenses to include designated individuals to its Exchanges. In the meantime, because the process is opaque and unpredictable—lacking any concrete timelines or discernible standards—the Foundation has been left in limbo, without any assurance that its applications will be approved or, even if they are, that they will be approved in time to matter.

70.     For example, the Foundation has been forced to exclude Dr. Mohammad Marandi—an American-born Iranian academic and advisor to Iran's nuclear negotiating team in Vienna, Austria—from two of its Yemen-related Exchanges, and it may have to exclude him from another upcoming Exchange, due to OFAC's failure to respond to the Foundation's request for clarification and a specific license. The Foundation had hoped to include Dr. Marandi in two now-past Exchanges because he is heavily involved in Iranian foreign policy and has a broad understanding of regional Gulf dynamics and Iran's contentious relationship with the United States. Although Dr. Marandi is not designated, the Foundation became concerned after receiving OFAC's December 2022 letter that the agency might consider him to be subject to the Iranian Transactions and Sanctions Regulations because of that sanctions regime's broad scope. For that reason, the Foundation suspended its plans to include Dr. Marandi in its Exchanges pending written assurance from OFAC that the Foundation could include him as a speaker. The Foundation first asked OFAC for that written assurance on January 24, 2023, but to date OFAC has not substantively responded. As a result, the Foundation excluded him from the January 2023 Yemen and Gulf Exchange and the September–October 2023 Yemen Exchange, and the Foundation is uncertain if it will be able to include him in its upcoming 2024 Yemen and Gulf Exchange. Regardless of whether OFAC ultimately allows Dr. Marandi to participate in future Exchanges, the time-consuming and uncertain process has already harmed the Foundation and will continue to burden it going forward.

71.     Taken together, OFAC's interpretation of its authority and its administration of the sanctions regimes effectively give the U.S. government the ability to limit and skew the discussions that take place during the Foundation's Exchanges. They deny the Foundation and

Exchange participants access to the full range of speakers and information necessary to understand and examine the intricacies of complex foreign politics.

72.     OFAC's determinations also prevent the Foundation's leadership from gaining access to knowledge that is critical to its mission. Prohibiting the Foundation from including designated individuals in its Exchanges undermines the Foundation's ability to curate effective Exchanges that present a comprehensive picture of the political landscape in the subject regions. It also undermines the Foundation's ability to engage in other forms of public education and advocacy. To continue hosting the comprehensive political dialogues the Foundation seeks to foster through its Exchanges, the Foundation must have up-to-date information about the relevant country's changing dynamics and political climate. This information is best acquired from the most important stakeholders and decisionmakers in the region, many of whom are designated individuals. By denying the Foundation the ability to speak with these stakeholders and decisionmakers at its Exchanges, OFAC has compromised the Foundation's ability to maintain the institutional knowledge and credibility necessary to provide an enriching experience to Exchange participants. OFAC has also compromised the ability of the Foundation, through its director Mr. Noe, to use the information he would otherwise derive from speaking with a comprehensive array of Exchange participants to inform his public writing and advocacy on behalf of the Foundation.

73.     Though OFAC's interpretation of its regulations burdens the Foundation's ability to carry out its mission, it does not advance any legitimate government interest. As Congress has observed, the exchange of ideas across borders advances U.S. foreign policy goals. In the Conference Report accompanying the 1994 amendments to IEEPA, Congress explained that "engaging in educational, cultural and other exchanges with persons from around the world" can "significantly promote the foreign policy objectives of encouraging democracy and human rights

abroad, and improving understanding of and goodwill toward the United States abroad." H.R. Rep. No. 103–482, at 238 (1994) (Conf. Rep.). Indeed, private citizens engaged in exchanges like the Foundation's own "are frequently the best purveyors of the values of American civilization." *Id.*

## CAUSES OF ACTION

### COUNT 1

### APA Claims

74.     OFAC's interpretation and application of its regulations to prohibit the Foundation from including designated individuals in its Exchanges exceed the agency's regulatory and statutory authority because including these individuals in the Foundation's Exchanges does not constitute a "service" within the meaning of the regulations; because the Foundation's Exchanges involve "personal communications" that OFAC has no authority to regulate; and because the Foundation's Exchanges involve the importation or exportation of "information" or "informational materials" that OFAC has no authority to regulate. OFAC's interpretation and application of its regulations to prohibit the Foundation from including designated individuals in its Exchanges also violate the First Amendment and are an abuse of discretion. They must therefore be set aside under the APA. *See* 5 U.S.C. § 706(2)(A)–(C).

75.     OFAC's decision to block the Foundation from including Ammar Moussawi and Ali Fayyad in the 21st Beirut Exchange based on its assertion that they are "SDGTs" is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, because OFAC designated them without following its mandatory regulatory procedure. It must therefore be set aside under the APA. *See* 5 U.S.C. § 706(2)(A), (D).

## COUNT 2

### Ultra Vires Claims

76.    OFAC's interpretation and application of its regulations to prohibit the Foundation from including designated individuals in its Exchanges are *ultra vires* because they restrict activity that OFAC does not have authority to restrict, *see, e.g.*, 50 U.S.C. § 1702(a)(1)(B) (allowing the blocking of "any property in which any foreign country or a national thereof has an interest by any person, or with respect to any property, subject to the jurisdiction of the United States"), and because they restrict personal communications and the importation or exportation of information or informational materials that are exempt from IEEPA, *see id.* § 1702(b)(1), (3); *see also* Exec. Order No. 13,224 § 2.

## COUNT 3

### First Amendment Claims

77.    OFAC's interpretation and application of its regulations to prohibit the Foundation from including designated individuals in its Exchanges violate the First Amendment because they deny the Foundation the opportunity to speak with, hear from, and associate with designated individuals; because they impose a prior restraint on protected speech; because they target disfavored views, content, and speakers; because they deter the Foundation's expressive and associational activity; and because they are not sufficiently tailored to any legitimate government interest.

### PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A.    Declare that OFAC's interpretation and application of its regulations are unlawful and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(C);

B.  Declare that OFAC's decision to prohibit the Foundation from including Ammar Moussawi and Ali Fayyad in its Exchange based on OFAC's assertion that they are "SDGTs" is unlawful and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D);

C.  Declare that OFAC's interpretation and application of its regulations are *ultra vires*;

D.  Declare that OFAC's interpretation and application of its regulations violate the First Amendment to the Constitution;

E.  Permanently enjoin Defendants from enforcing the LSR, GMSR, GTSR, and associated statutes against the Foundation for hosting Exchanges that include designated individuals, or individuals who are associated with designated organizations;

F.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

G.  Grant such other and further relief as the Court deems just and proper.


Dated: December 20, 2023                        Respectfully submitted,

                                                 /s/ *Jameel Jaffer*
                                                _____
                                                Jameel Jaffer
                                                Anna Diakun*
                                                Alexia Ramirez*
                                                Xiangnong Wang*
                                                Alex Abdo*
                                                Knight First Amendment Institute
                                                  at Columbia University
                                                475 Riverside Drive, Suite 302
                                                New York, NY 10115
                                                (646) 745-8500
                                                jameel.jaffer@knightcolumbia.org

                                                 /s/ *Joshua Andresen*
                                                _____
                                                Joshua Andresen*
                                                Scientia Guidance Ltd.
                                                50 St. Mary's Road

Hemel Hempstead
HP2 5HL
United Kingdom
+447849264043
joshua.andresen@scientiaguidance.com

*application for admission *pro hac vice*
  forthcoming

*Counsel for Plaintiff*